TRULINCS 49148048 - PARKER, DONALD HOWARD - Unit: TRM-J-A

---

FROM: Legal, Lisa
TO: 49148048
SUBJECT: NPR Newsflash! BOP Healthcare Driven by 'Delay and Ignore'   LISA Newsletter for September 25, 2023
DATE: 09/24/2023 07:51:26 PM

LISA publishes a free newsletter sent every Monday to inmate subscribers in the Federal system.

Edited by Thomas L. Root, MA, JD

Vol. 9, No. 39

<><>

NPR Blasts Substandard BOP Healthcare
6TH Circuit Refuses En Banc On Stacked 924(C) Sentences
Preview of Coming Events
$117 A Day Won't Buy You Performance

<><>

NPR BLASTS SUBSTANDARD BOP HEALTHCARE

In a report that won't shock a single Bureau of Prisons inmate, NPR reported this past weekend that the BOP has misrepresented the accreditation of its healthcare facilities while compiling a record of ignoring or delaying medical treatment especially in cancer care   leading to needless inmate disability and death.

NPR said it had obtained hundreds of BOP records that showed, among other things, that over 25% of the almost 5,000 inmates who died in federal custody from 2009 to 2020 died in a single place: FCC Butner. According to NPR's analysis, more BOP prisoners died of cancer than any other cause from 2009 to 2020.

More deaths at Butner are to be expected, given the complex includes FMC Butner, the system's largest cancer treatment facility. However, NPR reported, it found

"numerous accounts of inmates nationwide going without needed medical care. More than a dozen waited months or even years for treatment, including inmates with obviously concerning symptoms: unexplained bleeding, a suspicious lump, intense pain. Many suffered serious consequences. Some  did not survive. Too often, sources told NPR, federal prisons fail to treat serious illnesses fast enough. When an ailment like cancer is caught, the BOP often funnels these sick inmates to a place like Butner, where it is assumed they'll receive more specialized treatment. But by the time prisoners access more advanced care, it's sometimes too late to do much more than palliative care. What's more, current and former inmates and staff at Butner told NPR the prison has issues of its own, including delays in care and staffing shortages."

NPR caught the BOP in a falsehood. The agency says on its website that "Federal Medical Centers (FMCs) are accredited by the Joint Commission," the nation's leading healthcare accreditation agency. But NPR found that was untrue. BOP's certification lapsed two years ago.

Sources NPR interviewed said federal inmates are dying more often than they should. "Deaths in custody should be rare events, given that this is such a controlled environment," says Michele Deitch, director of the University of Texas at Austin's Prison and Jail Innovation Lab. "Are there preventable deaths happening in the BOP? The answer to that is clearly yes."

NPR quoted an anonymous BOP medical staff member at Butner who said she has heard stories like theirs "so many times  So many inmates have told me, 'I complained about this lump, or I complained about this pain for so long, and they only gave me cream, they only gave me Motrin, they never sent me out for tests or anything. Now they send me here and I have Stage 3 or Stage 4 cancer. Our question is always: What took them so long to get to us, and why did they send them to us when there's nothing that we can do?"

Art Beeler, a former Butner warden, told NPR it was hard to see inmates arrive at the FMC with late-stage cancer. "There were cases we received late, and every one of them was frustrating," Beeler said. "If we received someone who had Stage 4 prostate cancer, who showed indicators early on in the process, we were very frustrated... We knew more than likely the patient would live if they had received treatment early on."

TRULINCS 49148048 - PARKER, DONALD HOWARD - Unit: TRM-J-A

--------------------------------------------------------------------------------

In March 2022, the Dept of Justice Inspector General audit of the BOP's contract with a medical service contractor at Butner, found the BOP "did not have a reliable, consistent process in place to evaluate timeliness or quality of inmate healthcare."

The IG report also noted "challenges in transporting inmates to off-site appointments which resulted in a frequent need to reschedule appointments that could delay an inmate's healthcare." The contractor told the Inspector General that their staff spent a "significant amount of time" canceling and rescheduling inmate appointments."

"We believe it is difficult for the BOP to determine whether inmates are receiving care within the required community standard," the report noted.

Delshon Harding, president of the union local representing Butner officers, told NPR he believes staff shortages are the primary reason inmates go without essential care.

A report issued last week by three federal agencies   including DOJ   found that as of March 2022, 89% of all BOP facilities had one or more clinical position vacancies. Thirteen prisons lacked any staff medical officer. Only 69% of BOP medical officer positions were filled.

NPR, 1 in 4 inmate deaths happens in the same federal prison. Why? (Sep 23)

BOP, Medical Care (last visited Sep 23)

Dept of Justice, Audit of the Federal Bureau of Prisons Comprehensive Medical Services Contracts Awarded to the University of Massachusetts Medical School (Mar 2022)

Veterans Administration, Review of Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic (Sep 21)
<><>

6TH CIRCUIT REFUSES EN BANC ON STACKED 924(C) SENTENCES

Tom Plummer used a gun in a string of Hobbs Act robberies. He ended up with 105 years when he was sentenced before passage of the First Step Act, which reduced mandatory minimum sentences for stacked 18 USC 924(c) offenses like his. Tom's sentence was vacated because of errors, and he was not resentenced until after First Step became law.

First Step, if applied to Tom's sentencing, would reduce his 924(c) mandatory-minimum sentence from 105 to 25 years. But despite the First Step's retroactivity provision, and despite Tom's pre-FSA sentence being thrown out, a three-judge panel held that Tom had to be resentenced under the old version of the statute.

First Step Sec 403(b) provides that the new 924(c) sentencing statute would apply to offenses committed before the Act "if a sentence for the offense has not been imposed as of such date of enactment." The Circuit believes that if a defendant was sentenced for a 924(c) offense before December 2018   even if the sentence was vacated later   any new 924(c) sentence would have to be imposed under the old law.

Last week, the 6th denied en banc review. Judge Bloomekatz spoke for six dissenters, however, in an opinion that some commentators think was an effort to get the Supreme Court's attention:

The real human costs that this esoteric legal issue presents also should not be overlooked. Because our circuit has split from every other to reach this issue, defendants in Kentucky, Michigan, Ohio, and Tennessee will often have to serve decades longer sentences than those in most of the other states. [Tom Plummer] proves this point. His sentence is 80 years longer than it would be if he had been resentenced in the 17 states that comprise the 3rd, 4th, and 9th Circuits. The resulting sentencing disparity  should give us pause enough to consider the decision as a full court. Indeed, the circuit split, the federal government's position, the dissent from then-Judge Barrett in US v Uriate, and the dueling opinions on this en banc petition underscore that the scope of the retroactivity provision is far from clear.

Writing in his Sentencing Law and Policy blog, Ohio State University law professor Doug Berman said because Tom Plummer has already served over 10 year in prisons," he "may soon be eligible for a reduction in sentence under the 'unusually long sentences' criteria in the US Sentencing Commission's proposed new [1B1.13] 'Compassionate Release' policy statement."

TRULINCS 49148048 - PARKER, DONALD HOWARD - Unit: TRM-J-A

---

In his legal blog, UCLA law prof Eugene Volokh said of the opinion, "The en banc denial which garners two dissentals solidifies a circuit split, so keep an eye on this one."

US v Carpenter, Case No 22-1198 (6th Cir, Sep 18, 2023)

US v Uriate, 975 F.3d 596 (7th Cir. 2020)

Sentencing Law and Policy, Notable debate among Sixth Circuit judges as court turns down en banc review of "resentencing retroactivity" after FIRST STEP Act (Sep 20)

The Volokh Conspiracy, Short Circuit: A Roundup of Recent Federal Court Decisions (Sep 22)
<><>

PREVIEW OF COMING EVENTS

With Congress careening toward a federal government shutdown, a freshly indicted senator being pressured to quit, and about 300 military appointments being held up by another senator, it's looking incresingly doubtful that Congress will do anything in the next 27 work days to block the Sentencing Guideline amendments from becoming effective on Nov 1.

Former Sentencing Commission attorney Mark Allenbaugh, founder of the website Sentencing Stats, has rolled out a web tool for people to use in order to determine whether they qualify for the retroactive zero-point Criminal History guidelines reduction. It can be found at https://www..zeropointoffender.com.

Meanwhile, the Supreme Court returns to work after a 3-month vacation for its annual "long conference.." At the Tuesday long conference, the Justices will decide which of some 2,000 petitions for writ of certiorari   about 25% of all petitions filed during the year   should be granted review.

"The summer list is where petitions go to die," Gregory G. Garre, a solicitor general in the George W. Bush administration, told the NY Times back in 2015. While the odds of getting the Supreme Court to grant review of a case are about one in a hundred, At the long conference, the rate is roughly half of that, about 0.6%.

Zero Point Offender

NY Times, Supreme Court's End-of-Summer Conference: Where Appeals 'Go to Die' (Aug 31, 2015)
<><>

$117 A DAY WON'T BUY YOU PERFORMANCE

The BOP announced in late 2022 that it was developing a calculator to project the maximum number of earned-time credits now being called FSA credits   a prisoner could earn at the outset of a sentence. That way, a prisoner would know upfront his or her projected release date and the date that halfway house or home confinement could begin.

You may have been skeptical, recalling that in 2022, the BOP promised monthly auto-calculation of FSA credits that never happened, either. Writing in Forbes magazine last week, Walter Pavlo reported that the BOP has likewise been unable to determine likely dates for prerelease custody, depriving inmates of benefits of FSA credits to which they are entitled by law because the BOP is unable to scramble to arrange halfway house or get residence approval for home confinement.

"There is no date for when this calculation issue will be addressed," Pavlo wrote. "Until then, prisoners continue to line up outside of their case manager's office to plead their case that their release date is closer than what the BOP is calculating. As one prisoner told me, 'My case manager said, 'the computer tells your release date and it could be tomorrow, or next week, or next year, it does not matter to me. But I don't have the ability to make that decision myself'."

The BOP Office of Public Affairs told Pavlo that "credits cannot be applied to an individual's projected release date until they are actually 'earned...' It is feasible that earned credits could be greater than the number of days remaining to serve. The BOP's position, according to Pavlo, is that "ordinarily, the applicability of time credits towards pre-release custody will be limited to time credits earned as of the date of the request for community placement. However, in an effort to ensure eligible adults in custody receive the maximum benefit, the agency is developing additional auto-calculation applications that will calculate a "Conditional FSA Release Date" and an "Earliest Conditional Pre-Release Date" which would include the maximum FTC benefit."

TRULINCS 49148048 - PARKER, DONALD HOWARD - Unit: TRM-J-A

----------------------------------------------------------------------------------------

Basically, the BOP is still trying to figure out how to implement a First Step program it knew about 5 years ago.

Maybe that's all the performance you can expect for $117 a day. That's what the BOP said last week is the current average cost of incarceration based on fiscal year 2022 data. The average annual COIF for a Federal inmate housed in a halfway house for FY 2022 was $39,197 ($107.39 per day).

Forbes, Bureau of Prisons' Challenges With First Step Act Release Dates (Sep 17)

BOP, Annual Determination of Average Cost of Incarceration Fee (COIF), 88 FR 65405 (Sep 22)
<><>

The LISA Newsletter is copyright 2023, LISA Foundation, PO Box 636, Norwalk OH 44857.

For privacy, we use pseudonyms for people who are still incarcerated.

If you have a question, please send a new email to newsletter@lisa-legalinfo.com.

TRULINCS 49148048 - PARKER, DONALD HOWARD - Unit: TRM-J-A

-------------------------------------------------------------------------------

FROM: Legal, Lisa
TO: 49148048
SUBJECT: What To Know In Applying For Criminal History Sentence Reduction   LISA Newsletter for October 30, 2023
DATE: 10/29/2023 07:51:44 PM

LISA publishes a free newsletter sent every Monday to inmate subscribers in the Federal system.

Edited by Thomas L. Root, MA, JD

Vol. 9, No. 44

<><>

Retroactive Guidelines Become Effective   What Now?
BOP Smacked By Chevron But Stands Tough On Denying FSA Benefit
Carswell Medical Care On Trial In South Florida Hearing

<><>

RETROACTIVE GUIDELINES BECOME EFFECTIVE   WHAT NOW?

In two days, the first Guidelines amendments in 5 years will become effective, including the 2 retroactive criminal history Guidelines, the first retroactive guidelines in almost a decade.

I've gotten a lot of questions about the two retroactive Guidelines. Here's a little guidance.

A Guidelines amendment doesn't help anyone who's already been sentenced unless it is designated as being retroactive. There haven't been many over 34 years. If the amendment is retroactive, it will be listed in USSG 1B1.10(c).

The two retroactive Guidelines are found in Amendment 821. Part A of the amendment cuts "Status Points"   the two points added to criminal history scores when the offense was committed while on probation, parole or supervised release from another crime   by one point for people with seven or more criminal history points and eliminates them altogether for people with six or fewer criminal history points.

Part B of the Amendment creates a new USSG 4C1.1 that provides a decrease of two offense levels for "Zero-Point Offenders" (no criminal history points) whose offense did not involve specific aggravating factors:

  No adjustment under USSG 3A1.4 (terrorism);

  Defendant did not use violence or threats of violence in the offense;

  The offense did not result in death or serious bodily injury;

  The offense of conviction is not a sex offense;

  Defendant did not personally cause substantial financial hardship;

  Defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in the offense;

  The offense is not covered by USSG 2H1.1 (involving individual rights);

  Defendant did not receive an adjustment under 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or 3A1.5 (Serious Human Rights Offense); and

  Defendant did not receive an adjustment under 3B1.1 (aggravating role) and was not engaged in a continuing criminal enterprise under 21 USC 848.

People with release dates before February 1, 2024, will not be able to receive a reduction in their sentences.

TRULINCS 49148048 - PARKER, DONALD HOWARD - Unit: TRM-J-A

----------------------------------------------------------------------------------------------------

To get the retroactive Guideline reduction, you file a motion under 18 USC 3582(c)(2). There's no exhaustion of administrative remedies   no need to send a copout to the warden   before filing. You simply write a motion and file it.

A motion should first show the court that you are eligible for the reduction. That's not always a slam dunk. For the status point reduction, if taking off the one or two points you will save does not drop you to a lower Criminal History Category, "status point" retroactivity won't help you. For the "zero point" reduction, you have to show that you meet the conditions.

Eligibility is a legal question. You are or you aren't. But once the eligibility is established, it becomes a matter of the judge's discretion. The court can give you a sentence reduction that cannot be more than the bottom of your new sentencing range. But the judge may decide to give you less than the bottom of the new range or even give you nothing at all. And what the judge decides as far as the amount of reduction you can get is unreviewable.

For that reason, a well-written motion for sentence reduction will not only explain to the court about your history and the offense but also cite post-sentencing reasons   such as a good disciplinary record or a history of programming   that convince the court that the reduction is deserved and consistent with the sentencing factors of 18 USC 3553(a).

A note on below-Guidelines sentences: Sec 1B1.10 suggests to the court that it may grant you a reduction, but "a reduction comparably less than the amended guideline range  may be appropriate." The Guideline gives the example of someone who was sentenced 20% below his original sentencing range. In that case, 1B1.10 suggests, "a reduction of approximately 20 percent below the minimum term of imprisonment provided by the amended guideline range  would amount to a comparable reduction and may be appropriate."

Sentencing Law and Policy, Gearing up for new guidelines amendments becoming law and working through criminal history retroactivity (Oct 25)

Alan Ellis, How Zero-Point Offender Change Should Work Retroactively (Oct 6)

USSC, Materials Relating To The 2023 Criminal History Amendment
<><>

BOP SMACKED BY CHEVRON BUT STANDS TOUGH ON DENYING FSA BENEFIT

Writing in Forbes this week, Walter Pavlo flagged a First Step Act credit benefit that the Bureau of Prisons has been denying to prisoners except where courts order otherwise. With the Supreme Court primed this term to rein in the Chevron deference doctrine   the judicial rule that courts defer to federal agencies' interpretation of the statutes they administer   the BOP's denial of FSA credits until an inmate reaches his or her assigned institution is an excellent case of how even Chevron can ban some BOP overreaching.

The FSA provides that a prisoner "who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits" according to a set schedule. Under 18 USC 3632(d)(4)(B), otherwise-eligible prisoners cannot earn FSA credits during official detention before the prisoner's sentence commences under 18 USC 3585(a)." Section 3585(a) says a "term of imprisonment commences on the date the prisoner is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served."

But the BOP puts its own gloss on the statute, directing in 28 CFR 523.42(a) that "an eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences (the date the inmate arrives or voluntarily surrenders at the designated Bureau facility where the sentence will be served)."

This rule can create months of FSA credit dead time.

Ash Patel filed a habeas petition seeking FSA credit from his sentencing in September 2020 until he finally reached his designated institution on the other side of the country in April 2023. The BOP argued his FSA credits only started in April 2023. The agency cited 28 CFR 523.42(a) and urged the Court to apply Chevron deference, accepting its interpretation of when FSA credits start.

The Court didn't buy it. "Because Section 523.42(a) sets a timeline that conflicts with an unambiguous statute, it is not entitled to Chevron deference and the Court must give effect to the statutory text," the judge wrote.

TRULINCS 49148048 - PARKER, DONALD HOWARD - Unit: TRM-J-A

----------------------------------------------------------------------------------------

Pavlo complains that perhaps thousands of other prisoners 'who were sentenced and have months of time in transit getting to their final designated facility are currently not getting those credits." Pavlo notes that "prisoners who have a disagreement with the BOP have access to an administrative remedy process to air their grievances. However, those in the chain of command at the BOP who would review those grievances have no authority within the BOP to award these credits as it deviates from the BOP's own Program Statement, which remains unchanged... Currently, the only solution is for every prisoner who has this situation is to exhaust the administrative remedy process, something that could take 6-9 months, and go to court to find a judge who agrees with [Patel v Barron] "

Not necessarily.. A Hawaii court in Huihui v Derr Court excused exhaustion because "further pursuit would be a futile gesture because there is an error in [the BOPs] understanding of when Petitioner can begin earning credits under 18 USC 3632(d)(4)(B) and 3632(a) [A]ny further administrative review would not preclude the need for judicial review."

Forbes, Bureau of Prisons' Dilemma On First Step Act Credits (Oct 27)

Patel v Barron, Case No C23-937, 2023 USDist LEXIS 174601 (WD Wash. Sept 28, 2023)

Huihui v Derr, Case No 22-00541, 2023 USDist LEXIS 106532 (D Hawaii, June 20, 2023)

Yufenyuy v Warden FCI Berlin, No. 22-CV-443, 2023 USDist LEXIS 40186 (D NH, Mar 7, 2023)
<><>

CARSWELL MEDICAL CARE ON TRIAL IN SOUTH FLORIDA HEARING

A woman whose federal sentence last April came with a promise by a BOP medical official that he'd personally see that she would receive the care she needed to treat her life-threatening seizure condition was back in court was back in court after only eight weeks in FMC Carswell, due to her attorney's concern that "the BOP has proven unable to manage or prevent these life-threatening episodes."

Sarah Kersey suffers from severe, stress-induced seizures. She went into cardiac arrest on the floor of the courtroom last year when she was convicted. When she was sentenced, her lawyer warned that sending her to prison could kill her.

At sentencing, the Court found that there was "no doubt" that Sarah "does suffer from a serious health condition, in fact perhaps a number of health conditions," that she was "medically frail," and that "she will require much medical care." But despite her undisputed seizure disorder and other medical ailments, the Court relied on testimony from the FMC Carswell Medical Director that the BOP could "provide Ms. Kersey with whatever medical care she needs."

Sarah self-surrendered in mid-July. Only two months later, her attorney told the court that Sarah "has required emergency outside hospitalization on at least two separate occasions. Specifically, counsel has been advised that Mrs. Kersey has suffered ongoing, repeated seizures including two major episodes with the latest episode involving cardiac arrest. (It has also resulted in blood clots that are now not being monitored) " The BOP's "repeated failure is contrary to the picture painted by the government at sentencing. Counsel has also been advised fellow inmates have been forced to attempt life-saving care during these seizures because prison officials failed to do so."

BOP medical official Mark Holbrook told the judge in April that the BOP could care for Sarah. But five months later, her heart and lungs briefly stopped working on the floor of a friend's cell. Inmates screamed at the guards to call for help. "Granny's eyes were wide open, but you could see that the light was no longer there," wrote one of two incarcerated women who performed CPR on Sarah until medics arrived. "She was gone."

"That was my mistake," Dr. Holbrook admitted to the judge at last month's hearing.

"He made several promises and several assurances. It appears none of which occurred," Sarah's attorney told the judge, the Palm Beach Post reported, "Letters from half a dozen inmates and the testimony of Carswell's own medical director depict a standard of care unlike the one Holbrook promised. One where Kersey must depend on her fellow inmates to keep her heart beating, and doubts over the legitimacy of her seizures dampen what care she does receive."

Maitee Serrano-Mercado, FMC Carswell's clinical director, testified that she was never contacted by Holbrook and prison staff only belatedly learned that Sarah had a history of seizures.

The Post noted that Carswell, dubbed by the Fort Worth Weekly in 2005 as a "hospital of horrors," is "the only federal medical

TRULINCS  49148048 - PARKER, DONALD HOWARD - Unit: TRM-J-A

---

facility for incarcerated women in the country. It lost its accreditation during the pandemic and has not gotten it back.

Serrano-Mercado said at the hearing that Sarah's seizures might not be real, but she admitted that a Carswell inmate who died in August had been sent there because she needed medical treatment for epileptic seizures that the Carswell staff said were faked, too.

Sarah told the Post in an email that the treatment of women at Carswell was "nothing short of torture  People come in here walking and leave in wheelchairs. People die here," she wrote. "I don't want to be one of them."

Palm Beach Post, 'Inexcusable': Attorney blasts federal prison officials over Boca woman's medical care (Oct 27)

Motion for Hearing (ECF 200), US v Kaye, Case No 9:21-cr-80039 (SD FL, Sept 12, 2023)
<><>

The LISA Newsletter is copyright 2023, LISA Foundation, PO Box 636, Norwalk OH 44857.

For privacy, we use pseudonyms for people who are still incarcerated.

Your family may read our newsletter online at www.lisa-legalinfo.com. If you want to receive the newsletter, send a Corrlinks invitation to newsletter@lisa-legalinfo.com.

If you have a question, please send a new email to newsletter@lisa-legalinfo.com.